# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **BERNARD DUNN,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:19-cv-00502-TES** |
| **SMITH & SONS, INC., d/b/a S&S CAFETERIAS,** | |
| *Defendant.* | |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Relying on the protections provided by federal law, Plaintiff Bernard Dunn brings this action against his former employer, Smith & Sons, Inc., for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See* [Doc. 1, pp. 7, 9]. With the benefit of discovery, Smith & Sons filed a Motion for Summary Judgment [Doc. 17] seeking dismissal of both claims asserted against it. Having reviewed the evidence presented by the parties and their respective arguments, Smith & Sons is not entitled to summary judgment on Dunn's sexual harassment and retaliation claims as a matter of law.

## FACTUAL BACKGROUND[1]

Smith & Sons is a family-run, cafeteria-style restaurant chain doing business as S&S Cafeterias. [Doc. 1, p. 1]; [Doc. 21-1, ¶ 1]. Dunn started working for Smith & Sons as a Beverage Server and Line Server on September 17, 2016, at the restaurant in Augusta, Georgia,[2] and he was terminated just over a year later on December 9, 2017. [Doc. 21-1, ¶ 2]; [Doc. 17-2, Albright Decl., ¶ 3]. As a new employee, Dunn received orientation materials and copies of Smith & Sons' employment policies, including: its General House Standards; an orientation checklist; the dress code policy;[3] a meal agreement for employees; and its anti-harassment policy. [Doc. 21-1, ¶ 3]. Each of these documents bear Dunn's signature. *See, e.g.,* [Doc. 17-2, pp. 13–16, 105, 107].

First, the General House Standards document provides 31 rules, but only four of them are relevant to Smith & Sons' arguments in defense of Dunn's claims:

- "Insubordination could lead up to disciplinary action and possible termination[]";

---

[1] Dunn filed a document entitled "Statement of Additional Material Facts to Which There is No Genuine Dispute"; however, the Court's Local Rules only permit "[t]he movant for summary judgment" to attach statements of material facts. LR 56, MDGa; [Doc. 20-4]. In the Middle District of Georgia, the nonmovant may only respond to each of the movant's material facts and, where appropriate, contend "there exists a genuine dispute to be tried." *Id.* With this rule in mind, the Court did not consider Dunn's additional document in ruling on Smith & Sons' summary-judgment motion.

[2] Augusta, Georgia, is located in the Southern District of Georgia; however, Smith & Sons admitted that venue in the Middle District of Georgia was proper since Smith & Sons' principal place of business is located at 2124 Riverside Drive, Macon, Georgia, 31204. [Doc. 6, ¶¶ 8–9]; *see also* 28 U.S.C. § 90(c)(1).

[3] In August 2017, Smith & Sons revised its dress code policy. [Doc. 20-3, ¶ 3]. Dunn signed this revised policy on September 15, 2017. [Doc. 17-2, p. 103].

- "NO FOOD OF ANY SORT M[A]Y BE TAKEN OUT OF THIS BUILDING[]";

- *"**Harassment** [is] **not tolerated by anyone**[]"; and*

- "[A]ll Personnel" must "[a]dhere to [the] dress code."

[Doc. 21-1, ¶ 5]; *see also* [Doc. 17-2, p. 13]. Second, not only do the original and revised

dress code policies require Line Servers to wear a "clean" and "wrinkle free" shirt, they

also prohibit men from having beards or goatees. [Doc. 21-1, ¶¶ 6–7]; [Doc. 17-2, pp. 16,

103]. Next, the meal agreement states that meals furnished by Smith & Sons are "to be

eaten on the premises." [Doc. 21-1, ¶ 8]; [Doc. 17-2, p. 105]. And finally, the anti-

harassment policy Dunn signed when he was hired prohibits "unwelcome sexual

advances," "physical conduct of a sexual nature[,]" and retaliation against any

employee for making a complaint of harassment and also states that employees should

report harassment to the unit manager and the district manager or to the "Personnel

Director" or "Vice President/Secretary/Treasurer of Smith and Sons Food, Inc.[,] at the

Corporate Office."[4] [Doc. 21-1, ¶ 4]; [Doc. 17-2, p. 107].

 During his 15-month employment, Dunn received four disciplinary write-ups for

policy violations (five, if you include the write-up he received simultaneously with his

---

[4] The record also contains a photograph depicting Smith & Sons' anti-harassment policy posted at the
Augusta restaurant. [Doc. 17-2, Albright Decl., ¶ 5]; [Doc. 17-2, pp. 10–11]. Even though Dunn doesn't
recall seeing the posting, he didn't testify that it wasn't posted. [Doc. 17-2, Dunn Depo., p. 23:17–25].
Regardless, the Court only mentions this specific posting to note that it is a revised anti-harassment
policy from 2012, and that while there are notable differences between the 2012 revision and the 1999
version Dunn signed, the anti-harassment message conveyed to Smith & Sons' employees stayed the
same. *Compare* [Doc. 17-2, p. 11] *with* [Doc. 17-2, p. 107].

termination). [Doc. 17-2, Dunn Depo., pp. 26:8—33:25]. Candidly, Dunn refused to sign the write-ups he believed to be inaccurate, but he did sign his first write-up issued to him on November 4, 2016, where his supervisor, Associate Manager Sandra Albright, wrote him up for failing to shave before coming to work and for arguing with management.[5] [Doc. 21-1, ¶¶ 9, 12–13]; [Doc. 17-2, Dunn Depo., pp. 26:8—27:4]. In February of the following year, General Manager Mike Wade issued Dunn a disciplinary write-up for taking food off the premises, but Dunn—even though he admits Mr. Wade issued the write-up—refused to sign it because he says he wasn't taking food from the restaurant. [Doc. 21-1, ¶ 14]; [Doc. 17-2, pp. 23–24]; [Doc. 17-2, Dunn Depo., pp. 28:5—30:13]. Six months later, Dunn admits that he was issued a disciplinary write-up for "taking [two] meats for his supper." [Doc. 21-1, ¶ 15]; [Doc. 17-2, p. 25]. Once again though, despite his testimony that he "was possibly warned about" taking two meats for his supper, Dunn refused to sign this August 2017 write-up. [Doc. 17-2, Dunn Depo., p. 31:5–22]; [Doc. 17-2, p. 25]. Then, on September 26, 2017, Ms. Albright issued Dunn another disciplinary write-up (which he signed) because he was not wearing a clean and wrinkle-free shirt in violation of the dress code policy. [Doc. 21-1, ¶ 16]; [Doc. 17-2, p. 26]; [Doc. 17-2, Dunn Depo., pp. 32:4—33:6]. Lastly, on December

---

[5] In addition to Ms. Albright (who reported to Mike Wade, the general manager of the Augusta restaurant), Peter Seaborn and Brad Himebaugh also supervised Dunn. [Doc. 21-1, ¶¶ 10–11].

9, 2017, there is a write-up, unsigned by Dunn, indicating that he was "being terminated for insubordination by arguing with management." [Doc. 21-1, ¶ 17]; [Doc. 17-2, p. 27].

While there may be a high degree of regularity by which Dunn received disciplinary write-ups, whether he agrees with them aren't why he's suing Smith & Sons. Rather, Dunn claims a female coworker, Stephanie Robinson, sexually harassed him and that Smith & Sons is liable because it failed to exercise reasonable care to prevent and promptly correct her actions. [Doc. 17-2, Dunn Depo., p. 40:17–25]; [Doc. 20, p. 12].

Ms. Robinson worked for Smith & Sons as a Checker. [Doc. 17-2, Dunn Depo., p. 42:11]. Her job was to ring up customers' meals and give them the ticket they would present to the cashier when they were ready to pay for their meals and exit the restaurant. [*Id.* at p. 42:13–17]. With Dunn working as a Beverage Server and Line Server and with Ms. Robinson working as a Checker, the two were stationed next to each other. [*Id.* at p. 42:9–12]; *see also* [Doc. 20, p. 2].

First, Dunn claims that sometime in early to mid-2017, Ms. Robinson started to "aggressively and intentionally rub[] her breast[] [and] her buttocks on [his] body while [they] were on duty in the line."[6] [Doc. 17-2, Dunn Depo., p. 41:1–4]. When this first happened, Dunn looked around to see if the area was crowded, possibly forcing Ms.

---

[6] Dunn testified that the only employee at Smith & Sons who sexually harassed him was Ms. Robinson. [Doc. 21-1, ¶ 42]; [Doc. 17-2, Dunn Depo., pp. 44:19–20, 47:11–15].

Robinson to bump against him. [*Id.* at p. 41:4–6]. However, once Dunn observed that the area behind Ms. Robinson was clear, he immediately told her, "[P]lease don't do that." [*Id.* at p. 41:4–8]. Because Ms. Robinson's actions "kept happening[,]" Dunn testified that he reported them to Ms. Albright and that she gave him "verbal assurance" that "she was going to investigate" his complaint. [*Id.* at p. 41:9–15]. According to Dunn, though, "nothing was done about it." [*Id.* at p. 41:18].

Second, in July 2017, Smith & Sons made record of another incident involving Dunn and Ms. Robinson. *See, e.g.*, [Doc. 17-2, pp. 29–30]. This time, Dunn approached Ms. Albright and told her that Ms. Robinson had sexually harassed him by making an offensive hand-gesture to him implying that he was gay. [*Id.*]; [Doc. 17-2, Albright Decl., ¶ 10]. Ms. Albright immediately brought Ms. Robinson in to question her. [Doc. 17-2, Albright Decl., ¶ 10]. With Dunn also present, Ms. Robinson admitted to Ms. Albright that she flipped her wrist to him but states that she only did so because Dunn started an argument with her. [*Id.*]. During the meeting, Ms. Albright told Dunn and Ms. Robinson that "they can only talk about work" and that "they are not allowed to talk about anything else while on the job[.]" [Doc. 17-2, Albright Decl., ¶ 10]. In fact, after this incident was brought to her attention, Ms. Albright says that she "worked to keep . . . Dunn and Ms. Robinson on different shifts so they would not interact." [*Id.* at ¶ 11].

Several days later, Ms. Robinson provided her own account of what happened in a written statement alleging that during the argument between herself and Dunn, Dunn

"call[ed] [her] fat" and "said that's why [she] look[s] pregnant."[7] [Doc. 17-2, Albright Decl., ¶ 10]; *see also* [Doc. 17-2, p. 31]. Even with the wrist-flipping incident at his disposal, Dunn doesn't rely on it to support his sexual harassment claim because Ms. Albright questioned Ms. Robinson, met with her, made notes about the incident, and made efforts to prevent it from happening again.[8] *See, e.g.,* [Doc. 17-2, Albright Decl., ¶¶ 10–11]; [Doc. 17-2, pp. 29–31]; *see generally* [Doc. 1]; [Doc. 20]. Rather than rehash an incident already addressed by Smith & Sons, Dunn narrows his factual account only to Ms. Robinson's "unwanted" touching.[9] [Doc. 17-2, Dunn Depo., p. 41:7].

In other words, Dunn's issue lies with Ms. Albright's "inappropriate response" to the "numerous" complaints he made about Ms. Robinson "continu[ously]" "rub[bing] her body parts on [him]." [*Id.* at pp. 42:1–2, 42:22, 43:2]; [Doc. 20, p. 4]. By Dunn's account, Ms. Albright did "nothing" after the first time he complained despite her "verbal assurance" that she would "investigate" the matter. [Doc. 17-2, Dunn Depo., p. 41:12–18]. After Dunn initially complained about Ms. Robinson's conduct, Dunn testified that he "guess[es] that [Ms. Albright] did not take [him] seriously . . . [or]

---

[7] During his deposition, Dunn denied ever calling anyone fat. [Doc. 17-2, Dunn Depo., p. 46:10–16].

[8] As Smith & Sons points out, "[t]he notes from that meeting show that Dunn made no allegations that [Ms.] Robinson made sexual advances towards him or rubbed her breasts or buttocks against him." [Doc. 17-3, p. 4]; [Doc. 21-1, ¶ 29].

[9] There was another incident that occurred about "three or four months prior to" Dunn's termination where Ms. Robinson supposedly asked Dunn about the size of his penis. [Doc. 17-2, Dunn Depo., pp. 89:22—90:16]; [Doc. 20, p. 3]. However, Dunn admits that he never mentioned this incident to Ms. Albright or to anyone else in management. [Doc. 17-2, Dunn Depo., p. 91:12–17].

thought that it was a joking [or] laughing matter." [*Id.* at p. 41:10–12]. And while Dunn may have "never sent any e-mails to Ms. Albright" about Ms. Robinson, he testified that he "verbally" complained to her before and after the meeting regarding the wrist-flipping incident "about eight or nine times." [*Id.* at pp. 43:21—44:10, 46:17–21]; [Doc. 21-1, ¶ 29]. Ms. Albright, on the other hand, states that "[a]fter" the wrist-flipping incident, Dunn "never complained that he had been sexually harassed again."[10] [Doc. 17-2, Albright Decl., ¶ 11].

Although Dunn testified that Ms. Robinson's conduct "stopped" "[t]oward the last month or so" of his employment, he sent a text message to Ms. Albright the morning he was terminated—December 9, 2017—asking, "Please have [Ms. Robinson] stop[] her hostile and harassing behavior." [Doc. 17-2, Dunn Depo., p. 43:15]; [Doc. 20-1, p. 2]. Later that day, Ms. Albright and another one of Dunn's supervisors, Brad Himebaugh, spoke to Dunn in person about timeliness, clocking in, and other job duties, and Ms. Albright informed Dunn that "management took care of the problem with [Ms. Robinson]." [Doc. 17-2, Albright Decl., ¶ 12]; [Doc. 17-2, p. 34]. According to Ms. Albright, Dunn, during the meeting, "kept trying to talk over [her] and would not listen[,]" and it was then Ms. Albright determined that Dunn "needed to be terminated for insubordination." [Doc. 17-2, Albright Decl., ¶ 12]; [Doc. 17-2, p. 34].

---

[10] Dunn only made complaints to Ms. Albright; he never complained to anyone else in management or at Smith & Sons' corporate office about Ms. Robinson's conduct. [Doc. 17-2, Dunn Depo., p. 44:11–18].

The following day, Ms. Albright confirmed with Mr. Wade that she intended to terminate Dunn, and Mr. Wade agreed. [Doc. 17-2, Albright Decl., ¶ 12]. As Ms. Albright and Mr. Wade were meeting with Dunn, he told them about the Charge of Discrimination he filed with the Equal Employment Opportunity Commission ("EEOC") on December 5, 2017, for sexual harassment.[11] [*Id.*]; [Doc. 21-1, ¶ 35]; [Doc. 17-2, Dunn Depo., p. 39:20–24]. However, both Ms. Albright and Mr. Wade swore that they were not aware of Dunn's charge prior to their agreement to fire him and that their termination decision was "based solely on his work performance and specifically his continued insubordination." [Doc. 17-2, Albright Decl., ¶ 12]; [Doc. 17-2, Wade Decl., ¶ 3]. Put succinctly, despite "insubordination" as Ms. Albright and Mr. Wade's stated reason for firing him, Dunn simply disagrees and argues that "his persistent complaints of sexual harassment" were the true reason he was terminated from Smith & Sons. [Doc. 20, p. 16]; [Doc. 17-2, Albright Decl., ¶ 12].

## DISCUSSION

### A.   Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[11] Dunn subsequently amended this charge on December 15, 2017, to add a charge for retaliation. [Doc. 17-2, Dunn Depo., pp. 39:25—40:3]; [Doc. 21-1, ¶ 36]. On September 24, 2019, the EEOC dismissed this charge and issued Dunn a Notice of Right to Sue letter, and he filed his Complaint on December 18, 2019. [Doc. 21-1, ¶ 37]; [Doc. 1, p. 11].

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[12] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively,

---

[12] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

### B.   Smith & Sons' Motion for Summary Judgment

As the basis for its motion, Smith & Sons argues that it is entitled to summary judgment because Dunn cannot establish a prima facie case for sexual harassment or retaliation and because its legitimate, nonretaliatory reason for terminating him was not pretextual. [Doc. 17-3, pp. 5, 12–14]; [Doc. 21, p. 9–10]. Before examining the substance of the parties' arguments, the Court first addresses Smith & Sons' argument that Dunn's sexual harassment claim "is almost entirely dependent on" a sham declaration that is improper evidence to oppose a summary judgment motion. [Doc. 21, p. 2].

### 1.   Dunn's Declaration

Generally, juries are tasked with resolving questions of credibility and the district court is not permitted to reject the contents of a declaration "even if it is at odds with statements made in an earlier deposition." *Shelley v. Wesleyan Coll.*, No. 5:18-CV-

380 (MTT), 2021 WL 141691, *5 (M.D. Ga. Jan. 14, 2021), *appeal docketed*, No. 21-10264 (11th Cir. Jan. 26, 2021) (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)). However, in *Van T. Junkins and Associates v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984), the Eleventh Circuit recognized an exception to this rule that allows district courts to disregard a statement made in a declaration "when, without explanation, it flatly contradicts . . . prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016) (citation omitted).

The exception, though, should be applied "sparingly," and a declaration may only be disregarded as a sham "when a party gives clear answers to unambiguous questions which negate the existence of any genuine issue of material fact" and that party, in a subsequent declaration, attempts to create a factual issue by providing evidentiary statements that contradict, without explanation, the answers previously given. *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) (quoting *Van T. Junkins*, 736 F.3d at 657); *see also Shelley*, 2021 WL 141691, at *5 (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)). Still though, "not every discrepancy between a[] [declaration] and earlier testimony renders the [declaration] a sham." *Shelley*, 2021 141691, at *5. That is why, when presented with the issue, district courts must distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* (quoting

*Tippens*, 805 F.2d at 953). Thus, this rule "only operates in a limited manner to exclude unexplained discrepancies and inconsistencies, as opposed to those 'which create an issue of credibility or go to the weight of the evidence'" because issues concerning credibility and weight are questions of fact which require resolution by a jury. *Furcron*, 843 F.3d at 1306 (quoting *Tippens*, 805 F.2d at 953); *Shelley*, 2021 141691, at *5 (quoting *Tippens*, 805 F.2d at 954). Finally, to disregard a declaration under this exception, the Eleventh Circuit "require[s] a court to find some inherent inconsistency between the [declaration] and a deposition." *Liebman v. Metro. Life Ins.*, 708 F. App'x 979, 982 (11th Cir. 2017).

In his declaration, Dunn stated:

1.  As I testified, Stephanie Robinson began sexually harassing me in the Spring of 2017. While the frequency of her rubbing her breasts and buttocks against me varied, she aggressively rubbed her body against mine in a sexual manner almost every week, sometimes three to four times per week and/or multiple times per day.

2.  Robinson's ongoing sexual harassment of me had a deeply negative impact on my ability to perform my job, due to the anxiety, stress, and mental anguish I suffered whenever I had to work with or near her.

3.  Her presence near me, once she began her offensive conduct, made it difficult to focus on my job tasks, as I was concerned about whether she was going to grind herself against me while at work.

[Doc. 20-2, ¶¶ 1–3].

Smith & Sons argues that this declaration should be disregarded because it is Dunn's attempt to establish certain elements for his sexual harassment claim—namely

frequency, severity, and interference with job performance—by including statements that are inconsistent with his earlier deposition testimony. [Doc. 21, pp. 3–5]; *see Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997), *infra*. Thus, a simple comparison of the two documents aimed at whether Dunn's declaration statements are inherently inconsistent with his deposition testimony is the easiest way to resolve this issue.

So, with respect to each paragraph from his declaration, what did Dunn say during his deposition? Obviously, the point Dunn is trying to make from the first paragraph of his declaration is that Ms. Robinson "frequen[tly]" "rubb[ed] her breasts and buttocks . . . against [him]." [Doc. 20-2, Dunn Decl., ¶ 1]. Twice, Dunn's deposition specifically mentions "breasts" and "buttocks." *See, e.g.*, [Doc. 17-2, Dunn Depo., pp. 41:2–3, 46:25—47:1]. After Dunn first mentions Ms. Robinson's breast and buttocks, both he and Smith & Sons' attorney reduce Ms. Robinson's "rubb[ing]" to a generic "it" and collectively refer to her conduct as "it" over 20 times. [*Id.* at pp. 41:7—46:24]. It is after the first mention of "breast" and "buttocks" that Dunn discusses "frequency."

Using "it" to encompass Dunn's allegations about Ms. Robinson's conduct, Smith & Sons' attorney asks him:

Q:     When did you first report *it* to Sandra Albright?

A:     Prior to my termination. It was probably several months. I don't know the exact month, but it was, like, probably early spring maybe, if I recollect, when *it* first started. And *it* just continued, like I said, *it* just never ceased. *It* was [*sic*], like, a daily thing, but *it* happened often enough where *it* was very offensive and *it* created a hostile work environment for me.

Q:      So you said that *it* was not [*sic*] a daily thing but *it* happened?

A:      Often enough that *it* —

Q:      Often enough?

A:      Right.

[*Id.* at pp. 42:23—43:11] (emphasis added).

First, it appears that one of three things happened in this line of questioning. Either Dunn misspoke or there is either a typo in the deposition transcript or Smith & Sons' attorney executed some skillful examination that went unchecked by Dunn and his attorney. According to the transcript, Dunn testified that Ms. Robinson's conduct "was, like, a daily thing." [*Id.* at p. 43:3]. Yet, in his follow-up question, Smith & Sons' attorney—perhaps in an attempt to clarify what Dunn had just said—asked, "So you said that it was *not* a daily thing but that it happened . . . [o]ften enough?" [*Id.* at p. 43:7– 8, 43:10] (emphasis added). Here, a reasonable interpretation of Dunn's response could confirm that "it happened" "[o]ften enough" and that Ms. Robinson's conduct wasn't a daily occurrence. [*Id.* at p. 43:7–9].

Regardless of whether Ms. Robinson's conduct was "a daily thing," it must be remembered that issue for determination, at this point, is whether Dunn's "often enough" testimony is inherently inconsistent with his "almost every week" statement made in his declaration. *Liebman*, 708 F. App'x at 982; [Doc. 17-2, Dunn Depo., p. 43:3–4, 43:9]; [Doc. 20-2, Dunn Decl., ¶ 1]. Notably, in his declaration, Dunn doesn't change

course and say that Ms. Robinson's conduct was a daily occurrence—he just tells the Court what he meant by "often enough."[13] [Doc. 17-2, Dunn Depo., 43:4].

Declarations that clarify previous testimony are not, by nature, shams. In *Van T. Junkins*, the Eleventh Circuit noted that "there may be some occasions where a party may[,]" by declaration, "clarify testimony given in his deposition and thereby create a genuine issue as to a material fact." 736 F.2d at 656. This is one such occasion.

Certainly, Dunn's attorney (when he was asking questions) could have extracted the "almost every week" testimony from Dunn during the deposition, but he didn't. What is contained in Dunn's post-deposition attempt to clarify "often enough" clearly creates issue of credibility and weight that must be put to a jury for resolution. *Furcron*, 843 F.3d at 1306 (quoting *Tippens*, 805 F.2d at 953); [Doc. 17-2, Dunn Depo., p. 43:4]. And because, at summary judgment, "all justifiable inferences" from the evidence have "to be drawn in [Dunn's] favor[,]" as the nonmovant, the Court will not disregard the statement provided in the first paragraph of Dunn's declaration. *Anderson*, 477 U.S. at 249.

---

[13] If you recall, Dunn testified that he reported Ms. Robinson's conduct to Ms. Albright "eight or nine" times. [Doc. 17-2, Dunn Depo., pp. 43:21—44:1]. However, the framework of this question-and-answer exchange is just too vague to conclude that Ms. Robinson had *actually* just inappropriately touched Dunn each time he claims to have reported her conduct. Just as easily, Dunn's answer could simply mean that he told Ms. Albright about a couple of instances eight or nine times. What is provided by the questions and answers in the deposition is too loose to conclude that Dunn's "magic number"—for frequency purposes—is eight or nine. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).

The other two sentences in Dunn's declaration center around the severity of Ms. Robinson's conduct and how it interfered with his job performance—two things Dunn has to prove to keep his sexual harassment claim alive. Candidly, when it comes to job performance, Dunn doesn't say much on the topic and what he does say, during his deposition, is of little help to his case. Dunn testified that although Ms. Robinson's conduct "really offended" him, he also testified that he "was pretty efficient with [his] job." [Doc. 17-2, Dunn Depo., pp. 42:3, 51:6]. However, context surrounding these two seemingly conflicting statements is key. Dunn's testimony that Ms. Robinson's conduct was offensive comes right after he first mentioned "breast" and "buttocks." *See, e.g.*, [*Id.* at pp. 41:1—42:7]. Whereas Dunn's claim that he was "pretty efficient" at his job comes in the midst of his testimony about Ms. Robinson's attempt to "try and take over [his] [work]station." [*Id.* at p. 51:2–14]. It is unlikely that Dunn could use Ms. Robinson's supposed attempt to take over his workstation to substantiate a sexual harassment claim because this specific act is non-sexual. *But see Lauderdale v. Tx. Dep't of Crim. Just. Institutional Div.*, 512 F.3d 157, 164 (5th Cir. 2007) (recognizing that acts, while not wholly sexual, can bring about "unwanted attention" that could "amount to pervasive harassment"). Nevertheless, discussion of these two conflicting statements is warranted given that they go to two essential elements of Dunn's sexual harassment claim.

Now, aside from the single instance of testimony that Ms. Robinson's conduct "really offended" Dunn, what else is in his deposition to aid the Court in determining

18

whether the statements made in the second and third paragraphs of his declaration are inherently inconsistent with "prior deposition testimony"? [*Id.* at p. 42: 3]; *Furcron*, 843 F.3d at 1306. Nothing. Since there is no deposition testimony by which to gauge an inherent inconsistency, the factual assertions made in these two paragraphs are simply evidence, and the Court cannot disregard them on basis that they were placed in the record as a sham. Fed. R. Civ. P. 56(c)(1)(A).

Taking Dunn's deposition testimony as well as each statement he made in his declaration as proper evidence, all that remains is determining whether he can make a prima facie case for his sexual harassment and retaliation claims.

### 2.      Dunn's Sexual Harassment Claim

On Dunn's sexual harassment claim, Smith & Sons begins its argument by pointing out that there are two types of sexual harassment cases: (1) quid pro quo cases which are based on carried-out threats and (2) hostile work environment cases which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000) (overruled on other grounds) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998)). Dunn does not advance a quid-pro-quo theory given that his allegations concern himself and another coworker; accordingly, the Court will only consider the second type of sexual harassment case. *See, e.g.*, [Doc. 20, p. 7 ("Sexual harassment by [coworkers] necessarily falls into the hostile work environment category

of sexual harassment[.]")]; *see also Furcron*, 843 F.3d at 1304 ("Sexual harassment that

takes the form of a hostile work environment is actionable under Title VII.").

When it comes to sex-based discrimination in the workplace, Title VII is

concerned with an employee's changes in employment by one of two ways. *Baldwin v.

Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007). The first is through a

tangible employment action, such as pay decreases, demotions, or termination. *Id.*

(citing *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004)). "The other way is

through creation of a hostile work environment caused by sexual harassment that is

sufficiently severe or pervasive to alter the terms and conditions of work[]"—this one is

the focus of Dunn's claim.

Generally speaking, a hostile work environment is one that is "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive

to alter the terms and conditions of . . . employment and create an abusive working

environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). To

that end, both parties agree that to establish a prima facie case for a hostile work

environment claim, Dunn must show

> (1) that he belongs to a protected group; (2) that he has been subject to
> unwelcome harassment; (3) that the harassment must have been based on
> a protected characteristic of the employee, such as [sex]; (4) that the
> harassment was sufficiently severe or pervasive[14] to alter the terms and

---

[14] The Court recognizes that the "severe or pervasive" inquiry requires "consideration of the social
context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore
Servs., Inc.*, 523 U.S. 75, 81 (1998).

conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Id.* Of these requirements, Smith & Sons asserts that Dunn cannot show the second, fourth, and fifth elements. [Doc. 17-3, pp. 7–9].

> a. *Subjected to Unwelcome Harassment*

For the second element, Dunn must show that he was subject to unwelcome harassment. *Miller*, 277 F.3d at 1275. Dunn's deposition testimony easily captures this element as he testified that Ms. Robinson's touching was "unwanted." [Doc. 17-2, Dunn Depo., p. 41:7, 41:25]. Notwithstanding this testimony, however, Smith & Sons argues that Dunn's allegations about her actions are "patently false" because he has no evidence that he ever complained about any other instance of sexual harassment besides the wrist-flipping incident. [Doc. 17-3, p. 7]. And, although this may be true, if the Court only considered Dunn's employee records filed in this case, Dunn's deposition testimony provides evidence that he reported Ms. Robinson's actions to Ms. Albright "eight or nine times." [Doc. 17-2, Dunn Depo., pp. 43:21—44:1]. Indeed, this evidence is, as Smith & Sons argues, an "unsupported allegation," but whether Dunn's testimony is true remains an issue of credibility.[15] And, following the Eleventh Circuit's

---

[15] Moreover, it bears noting that neither the 1999 version of Smith & Sons' anti-harassment policy—the version Dunn signed when he started working—or the revised 2012 version require employees to formally submit harassment complaints in writing in order to substantiate an allegation. *See, e.g.,* [Doc. 17-2, pp. 11, 107].

guidance in *Sconiers*, a credibility issue creates a factual issue that swings wide the doors to a jury trial. 946 F.3d at 1263. Dunn survives the second element.

      *b.*    *Severe or Pervasive Harassment*

As for the fourth element, Dunn has to demonstrate that "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Miller*, 277 F.3d at 1275. Here, Smith & Sons argues that "the incidents [Dunn] describes do not rise to the level of sexual harassment, let alone severe and pervasive harassment." [Doc. 17-3, p. 8]. To be clear though, the harassment need not be "severe *and* pervasive." [*Id.*] (emphasis added). Rather, the Supreme Court has instructed that a Title VII violation occurs when the harassment is "severe *or* pervasive to alter the conditions of . . . employment . . . ." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (emphasis added); *see also Harvill v. Westward Commc'ns L.L.C.*, 433 F.3d 428, 434–35 (5th Cir. 2005) (discussing the "severe or pervasive" test).

For a hostile work environment claim to be actionable, the harassment "must result in both an environment 'that a reasonable person would find hostile and abusive' and an environment that the [employee] 'subjectively perceive[s] . . . to be abusive." *Miller*, 277 F.3d at 1276 (second and third alterations in original). In other words, to establish that the harassment was severe or pervasive, an employee must satisfy both a subjective and objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th

Cir. 1999). That is, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and [*sic*] pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999).

Even though Dunn testified that Ms. Robinson "never groped . . . or touched [him] with her hands[,]" "never pursued [him] or asked [him] for his number[,]" or never talked to him about sex, he does state that her conduct "made it difficult to focus on [his] job tasks" because he was "concerned about whether she was going to grind herself against [him] while at work." [Doc. 17-2, Dunn Depo., pp. 41:25—42:1, 46:2–6, 47:3–4]; [Doc. 20-2, Dunn Decl., ¶ 3]. In light of Dunn's concerns, it goes without saying that he subjectively perceived Ms. Robinson's "unwanted" conduct as severe or pervasive. [Doc. 17-2, Dunn Depo., p. 41:7, 41:25].

The objective-component analysis, however, requires a little more. Dunn's subjective perception of Ms. Robinson's conduct must be objectively reasonable. *Mendoza,* 195 F.3d at 1246. That is, would a "reasonable person in [Dunn's] position, considering 'all the circumstances'" find Ms. Robinson's conduct sufficiently severe or pervasive? *Id.* (quoting *Oncale,* 523 U.S. at 81). To guide this analysis, the Supreme Court has identified four factors for consideration: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably

interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23). Smith & Sons reminds the Court that its analysis of Dunn's allegations about inappropriate behavior must be viewed in the "totality of the circumstances" and contends that when viewed through such a lens, Ms. Robinson's conduct simply wasn't severe or pervasive. [Doc. 17-3, p. 8]; *Mendoza*, 195 F.3d at 1246 ("The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.").

1.    <u>Frequency</u>

While it is true that Dunn never provides a set number of times Ms. Robinson "would rub her body parts on [him]," the law does not require him to do so. [Doc. 17-2, Dunn Depo., p. 42:1–2]. In the Eleventh Circuit, there is "no magic number [that] exists to enable a plaintiff to establish the harassment necessary to make out a [hostile work environment] claim." *Perry v. Rogers*, 627 F. App'x 823, 841 (11th Cir. 2015); *see* n.13, *supra*. Rather, "it is 'repeated incidents of harassment that continue despite the employee's objections that are indicative of a hostile work environment.'" *Id.* (quoting *Miller*, 277 F.3d at 1276) (alterations adopted).

The relevant time frame spans from early spring 2017 through November 2017—about a "month or so" before Dunn's termination. [Doc. 17-2, Dunn Depo., pp. 43:15,

44:2–5]. Although the frequency of her conduct "varied," Dunn provides evidence that on the weeks Ms. Robinson would "rub[] her body against [him] in a sexual manner[,]" she would do it "three to four times per week" and "multiple times per day." [Doc. 20-2, Dunn Decl., ¶ 2]. This factual assertion is enough, for summary-judgment purposes, to satisfy frequency. Moreover, as discussed above, parsing the difference between "often enough" and this "varied" weekly conduct would be to determine the credibility of what Dunn has offered as evidence, and that is not the function of the district court. *Anderson*, 477 U.S. at 255; *Sconiers*, 946 F.3d at 1263; [Doc 17-2, Dunn Depo., p. 43:4]; [Doc. 20-2, Dunn Decl., ¶ 2].

2.    *Severity*

There is no doubt that "Dunn found [Ms.] Robinson's conduct offensive[,]" but that only satisfies the subjective component of the fourth element of his prima facie case. [Doc. 20, p. 9]. Smith & Sons contends that, when viewed objectively, Ms. Robinson's conduct was not severe or pervasive enough to approach actionable sexual harassment. [Doc. 17-3, pp. 8–9]; [Doc. 21, pp. 4–7]; *Mendoza*, 195 F.3d at 1246. Here, the relevant evidentiary inquiry is whether the "endure[d] conduct . . . was so severe or pervasive that it altered the terms or conditions of [Dunn's] employment." *Mendoza*, 195 F.3d at 1247–48.

All of the sexually-based hostile work environment cases decided by the Supreme Court "have involved patterns or allegations of extensive, long[-]lasting,

unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment." *Id.* at 1247 (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999)). And more specific than that, the Eleventh Circuit has recognized that "[a] hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace." *Mendoza*, 195 F.3d at 1247 (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995)). And, when it comes to sexual harassment, what's true for a woman must also be true for a man. *See Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1741 (2020) (Title VII "works to protect individuals of both sexes from discrimination . . . .").

Smith & Sons provides a plethora of sexually-charged examples from within the Eleventh Circuit to attempt to debunk any definitive conclusion that Ms. Robinson's conduct was severe or pervasive enough to alter Dunn's working conditions. *See* [Doc. 17-3, p. 8–9]; [Doc. 21, pp. 5–7]. Truthfully, the cases cited in Smith & Sons' briefs were not enough to satisfy *severity* even though some of them included incidents of conduct that were as serious or more serious than the conduct at issue in this case. For example, in *Dar Dar v. Associated Outdoor Club, Inc.*, the Eleventh Circuit found that two incidents of inappropriate touching over a 22-month period were not severe. 189 F. App'x 82, 85 (11th Cir. 2007). However, the record evidence before the Court in this case simply presents too many factual inferences by which a reasonable jury could return a verdict

in Dunn's favor. *Info. Sys. & Networks Corp.*, 281 F.3d at 1224. Yes, there is a chance—like

many of the cases decided in this circuit—that a jury might not perceive Ms. Robinson's

conduct as severe, but severity is not the only avenue.

Even if Ms. Robinson's conduct doesn't rise to the level of severity required in

this circuit, this Court, like the Northern District of Alabama, finds the Fifth Circuit's

view of the "severe or pervasive" test persuasive. "[T]he test—whether the harassment

is severe or pervasive—is stated in the disjunctive."[16] *Livingston v. Marion Bank and Tr.*

*Co.*, 30 F. Supp. 3d. 1285, 1309 (N.D. Ala. 2014) (quoting *Lauderdale*, 512 F.3d at 163).

Meaning, "[f]requent incidents of harassment, though not severe, can reach the level of

'pervasive,' thereby altering the terms, conditions, or privileges of employment such

that a hostile work environment exists." *Lauderdale*, 512 F.3d at 163; [Doc. 20, p. 8

("[P]ervasive harassment will suffice.")].

The "big picture" of this case is Dunn's allegation that Ms. Robinson's unwanted

conduct went unredressed and that, as a result, it continued "over the course of several

months" and permeated his work environment.  [Doc. 20, p. 10]; *see also Mendoza*, 195

F.3d at 1247. Most notably, to distinguish this case from *Dar Dar*, Dunn's time period

spans only about nine months, and while he claims that other sex-based incidents

occurred, he cannot use them to support his hostile work environment claim because

---

[16] At least one circuit, the Seventh Circuit, has recognized "that direct contact with an intimate body part
constitutes one of the most severe forms of sexual harassment." *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir.
2001).

they were either addressed by Smith & Sons (wrist-flipping incident) or he never mentioned them to Ms. Albright or to anyone else in management (Ms. Robinson's question to Dunn about the size of his penis). 189 F. App'x at 85; [Doc. 17-2, Dunn Depo., pp. 43:15, 44:2–5, 91:12–17]. Thus, Dunn's hostile work environment claim has to be limited to Ms. Robinson's unwanted touching. And because critical factual determinations remain to be made as to how frequent Ms. Robinson "rubbed" against Dunn and how many times he told Ms. Albright about her conduct; a trial is required.[17] *Sconiers*, 946 F.3d at 1263. In short, this second factor, under this specific record, depends on a credibility determination that has to be made by a jury.

### 3.   *Physically Threatening or Humiliating*

Much more easily analyzed than the first two factors, this third factor—whether the conduct is physically threatening or humiliating—is easily satisfied by Dunn's deposition testimony. Dunn testified that Ms. Robinson would "aggressively and intentionally" "rub her body parts on [him]." [Doc. 17-2, Dunn Depo., pp. 41:2, 42:1–2]. Although, as mentioned above, Ms. Robinson "never groped" him or romantically

---

[17] In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, the Eleventh Circuit held that conduct similar to Ms. Robinson's coupled with 14 additional—but all different—incidents that the plaintiff perceived as sexual were sufficiently severe or pervasive to fall within the definition of sexual harassment. 234 F.3d 501, 506–08 (11th Cir. 2000). It was the fact that the plaintiff in *Johnson* pointed "to roughly fifteen separate instances of harassment over the course of four months," that the Eleventh Circuit held the harassment to be severe or pervasive. *Id.* at 509. True, Dunn suffered only one variation of harassing conduct within nine months, not 15 different types, but it is his factual assertion that when Ms. Robinson would "rub[] her body against [him] in a sexual manner[,]" she would do it "three to four times per week" and "multiple times per day" that makes his case readily distinguishable from *Johnson*. *Id.* at 506; [Doc. 20-2, Dunn Decl., ¶ 2].

pursued him, the record evidence shows that Dunn felt that her conduct "was just too much" and that it "really offended" him. [*Id.* at pp. 41:25—42:3]; *see also* n.16, *supra*.

Those are the allegations Dunn placed into evidence, and the Court must accept them as fact in ruling Smith & Sons' summary-judgment motion. *Sconiers*, 946 F.3d at 1263. Certainly, a jury is well within its rights to find that Ms. Robinson's conduct was not physically threatening or humiliating based on the evidence it may hear at trial, but at the summary-judgment stage, the Court simply can't decide questions of credibility. *Id.* Likewise, the Court is not in any position, based off of this record, to conclude that no reasonable jury could decide that Ms. Robinson's conduct doesn't fall within the definition of sexual harassment just because Dunn is a man. *Anderson*, 477 U.S. at 248.

### 4.   *Interference with Job Performance*

Because both parties geared most of their arguments towards frequency and severity, there is little to be said, from either perspective, why Dunn cannot meet the fourth factor—whether the conduct unreasonably interferes with the employee's job performance. The evidence, though, demonstrates that Ms. Robinson's conduct "caused anxiety, stress, and mental anguish" and had "a deeply negative impact on [Dunn's] ability to perform [his] job . . . whenever [he] had to work with or near her." [Doc. 20-2, Dunn Decl., ¶ 2]. In fact, Dunn states that Ms. Robinson's "presence near [him] . . . made it difficult to focus on [his] job tasks" because he was "concerned about whether she was going to grind herself against [him] . . . at work." [*Id.* at ¶ 3].

In light of the evidence, the Court recalls that the Supreme Court has recognized that "[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris*, 510 U.S. at 22. Dunn testified that "[t]he only thing that [he] really lost sleep over [was] the continued sexual harassment [he] sustained," of course, referring to Ms. Robinson "rubbing" her body against him. [Doc. 17-2, Dunn Depo., p. 92:14–16].

Looking at these four factors, it is clear that credibility determinations need to be made so that legitimate inferences can be drawn from the facts. *Anderson*, 477 U.S. at 255. The Court, simply, cannot undertake these tasks. *Id.* All the Court is allowed to do at summary judgment is believe Dunn's evidence, as the nonmovant; make all justiciable interferences in his favor; and determine whether one of those permissible inferences creates a genuine issue of material fact. *Id.* at 249, 255; *Sconiers*, 946 F.3d at 1263. Just in these four factors alone, there are genuine issues of material fact that remain for a jury's ultimate determination. Accordingly, the Court cannot grant summary judgment; instead, it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

Pulling back to the all-important, prima facie element: "Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions

of employment." *Mendoza*, 195 F.3d at 1247. For summary-judgment purposes, Dunn satisfied the fourth element because he has presented evidence through which a reasonable jury could determine that Ms. Robinson's conduct was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. *Miller*, 277 F.3d at 1275.

      *c.*    *Vicarious or Direct Liability*

Finally, the fifth element of the prima facie case requires Dunn to show that Smith & Sons, as the employer, is responsible for a hostile work environment under either a theory of vicarious or direct liability. Smith & Sons, of course, argues that Dunn cannot meet this element because "there is no basis for holding [it] liable for the actions of [a] [coworker] who was not a supervisor and did not subject him to any adverse employment actions." [Doc. 17-3, p. 9].

It is undisputed that Ms. Robinson was not Dunn's supervisor. [Doc. 20-3, ¶ 27]; [Doc. 17-2, Dunn Depo., p. 42:18–19]. Thus, Smith & Sons is "only liable if it 'knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *Johnson*, 234 F.3d at 510 (quoting *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)); *see also Baldwin*, 480 F.3d at 1302 ("When a plaintiff alleges that [his] employer is liable for the harassing conduct of [coworkers] instead of supervisors, the employer will be held liable only if it 'knew or should have known of the harassing conduct but failed to take prompt remedial action.'"). When an employer

can show that it exercised reasonable care to prevent and promptly correct harassing

behavior and that its employee unreasonably failed to take advantage of the employer's

preventive and corrective opportunities, it cannot be held liable for sexual harassment.

[Doc. 17-3, p. 9 (quoting *Swindle v. Jefferson Cnty. Comm'n*, 593 F. App'x 919, 923–24 (11th

Cir. 2014))]; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

 As indicated by his signature, Dunn knew that Smith & Sons' anti-harassment

policy prohibited "unwelcome sexual advances" and "physical conduct of a sexual

nature." [Doc. 17-2, p. 107]. The same policy also detailed to whom Dunn should report

sexual harassment. [*Id.*]. This prompts Smith & Sons' argument that "there is no

evidence that Dunn ever complained about [Ms.] Robinson sexually harassing him

other than" the quickly-addressed, wrist-flipping incident. [*Id.*]; [Doc. 17-3, p. 9]. Again,

though, the Court must state the obvious: Dunn's deposition testimony provides

evidence that he reported Ms. Robinson's "rubbing" to Ms. Albright "eight or nine

times" and that "nothing was done about it." [Doc. 17-2, Dunn Depo., pp. 41:18, 43:21—

44:1]; [Doc. 20-2, Dunn Decl., ¶ 1]. These statements are included in the evidence, and

whether they are true based on their "unsupported" or "unsubstantiated" nature is an

issue of credibility because Ms. Albright's statements in her declaration tell a different

story. *Sconiers*, 946 F.3d at 1263; [Doc. 17-3, pp. 8–9]; *see also* n.15, *supra*. Ms. Albright

states that after Dunn complained about the wrist-flipping incident, "he never

complained that he had been sexually harassed again." [Doc. 17-2, Albright Decl., ¶ 11].

Undeniably, Dunn and Ms. Albright's evidence produce "competing narratives . . . on key events," and when that happens, the Court is "not at liberty to pick which side [it] think[s] is more credible." *Sconiers*, 946 F.3d at 1263.

As for the text message Dunn sent to Ms. Albright on December 9, 2017, regarding Ms. Robinson's "harassing behavior[,]" Smith & Sons argues that "its relevance is deeply suspect" because he sent the text message "approximately five months" after he first complained about Ms. Robinson in July 2017.  [Doc. 17-2, Dunn Depo., p. 43:15]; [Doc. 20-1, p. 2]. Determinations that something is "deeply suspect" go directly to the weight of the evidence—a determination that is, by now, a well-known role of a jury. *Anderson*, 477 U.S. at 255. Since the Court is not allowed to make such a call, Smith & Sons will have to argue to a jury how it should regard Dunn's text message due to the fact that he testified that Ms. Robinson's conduct had "stopped" at the time he sent it. [Doc. 21, p. 7].

In large part, Dunn's sexual harassment claim heavily hinges on the weight and the credibility of factual assertions so that summary judgment is inappropriate. *Sconiers*, 946 F.3d at 1263. Therefore, Dunn has, for summary-judgment purposes, satisfied the fifth element of his prima facie case because he has presented evidence through which a

reasonable jury could determine that Smith & Sons either knew or should have known[18] of Ms. Robinson's harassment and failed to take remedial action. *Miller*, 277 F.3d at 1275; *Johnson*, 234 F.3d at 510. Accordingly, the Court must **DENY** summary judgment to Smith & Sons on Dunn's sexual harassment claim.

### 3.    Dunn's Retaliation Claim

Dunn's second claim is a retaliation claim in which he contends that Smith & Sons terminated him because of "his persistent complaints of sexual harassment." [Doc. 20, p. 16]. There are two approaches that may be used to prove retaliation: Direct evidence of retaliation or circumstantial evidence. If there is no direct evidence of unlawful retaliation, a plaintiff may avoid summary judgment with circumstantial evidence, utilizing the *McDonnell Douglas* burden-shifting framework. *Adams v. City of Montgomery*, 569 F. App'x 769, 772 (11th Cir. 2014) (citing *Brown v. Ala. Dep't of Transp.*,

---

[18] Dunn argues that Smith & Sons could have also became aware of Ms. Robinson's actions because "others witnessed [her] intrusive grinding." [Doc. 20, p. 11]. One such witness would be another one of Dunn's coworkers, Deborah Black. [Doc. 20-3, ¶ 45]. Early in this case, the Court faced an issue regarding an unsworn statement in which Ms. Black stated that she "noticed" Ms. Robinson "harassing [Dunn] sexually." [Doc. 1-3, p. 1]. Subsequent to Ms. Black's unsworn statement, "she provided sworn testimony" recanting her previous statement. [Doc. 21, p. 4]; *Compare* [Doc. 1-3] *with* [Doc. 5-2]. In her sworn declaration, Ms. Black states that she "has not witnessed any harassment . . . by Ms. Robinson." [Doc. 5-2, Black Decl., ¶ 10]. In briefing, Smith & Sons points out that Dunn "cites to" Ms. Black's unsworn statement "to support various arguments regarding the pervasiveness of the conduct at issue [and] its impact on Dunn[.]" [Doc. 21, p. 4, n.3]. However, even accepting what Ms. Black says in her sworn declaration—that she "never witnessed Ms. Robinson harass . . . Dunn[]"—Dunn still avoids summary judgment on his sexual harassment claim. [Doc. 5-2, Black Decl., ¶ 11].

Notably, neither party chose to take Ms. Black's deposition. So, in the event Dunn or Smith & Sons seek to present her as a witness at trial, the obligation will fall to them to extract testimony from her to explain the differences between her two statements. Whatever testimony she proffers, if any, can then be used by the jury to determine how much weight her testimony is due and whether she is a credible witness.

597 F.3d 1160, 1181 (11th Cir. 2010)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973). As the Court will explain, it is hard-pressed not to conclude that Dunn

doesn't have direct evidence of retaliation, but more on that later. First, the Court turns

attention to whether Dunn can avoid summary judgment through circumstantial

evidence.

A retaliation analysis begins with establishing the prima facie case. Making a

prima facie case for retaliation requires a plaintiff to show that he engaged in statutorily

protected activity and suffered an adverse action that was causally related to the

protected activity. *Gogel v. Kia Motors Mfg. Grp. of Ga., Inc.*, 967 F.3d 1121, 1134–35 (11th

Cir. 2020) (citations omitted). Once established, the prima facie case "creates a

'presumption that the adverse action was the product of an intent to retaliate.'" *Id.* at

1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). Then, the burden

shifts to the defendant "to rebut the presumption [of retaliation] by articulating a

legitimate, [nonretaliatory] reason for the employment action." *Id.* "If the [defendant]

produces such a reason, the presumption is rebutted, and the plaintiff must then

demonstrate that the 'proffered reason was merely . . . pretext,'" masking a retaliatory

action. *Id.*

Let's, of course, start with the prima facie case—whether Dunn can show that

"he engaged in statutorily protected activity, [that] he suffered a materially adverse

action, and [that] there was some causal relation between th[ose] two events." *Goldsmith*

*v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). First question: can Dunn show that he engaged in statutorily protected activity?

"Title VII 'recognizes two forms of protected conduct.'" *McWhorter v. Nucor Steel Birmingham Inc.*, 304 F. Supp. 3d 1185, 1193 (N.D. Ala. 2018) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999)). Via its opposition clause, Title VII protects an employee from retaliation if he has opposed any practice made an unlawful employment practice by Title VII. 42 U.S.C. § 2000e-3(a). Similarly, under the participation clause, Title VII protects an employee from retaliation if "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.*

Smith & Sons doesn't, nor could it reasonably, dispute that Dunn filing an EEOC charge is protected activity under the participation clause. *See Freeland v. HR Synergies LLC*, --- F. Supp. 3d ----, 2020 WL 7364507, at *7–8 (M.D. Ga. Dec. 15, 2020). Accordingly, Smith & Sons tracks a portion of its defense under the participation clause and presents evidence that although Dunn "mentioned an EEOC charge" during his termination meeting, Ms. Albright "did not know what he was talking about." [Doc. 17-2, Albright Decl., ¶ 12]. Even more telling, Smith & Sons contends, is the fact that Ms. Albright's "decision to terminate [Dunn] was based solely on his work performance and[,] specially[,] his continued insubordination." [*Id.*].

If, as Smith & Sons argues, Ms. Albright nor Mr. Wade—the supervisors who made the decision to terminate Dunn—didn't have knowledge that Dunn filed an EEOC charge, it is highly unlikely that he could "show the required causal relationship between his termination and any protected activity." [Doc. 21, p. 8]. However, this argument misses the point of Dunn's retaliation claim. Again, under its opposition clause, Title VII protects an employee from retaliation if he has *opposed* any practice made an unlawful employment practice by Title VII. 42 U.S.C. § 2000e-3(a).

Let's quickly recap the relevant facts. Within 15 months of employment, Dunn received four disciplinary write-ups, and frankly, not all of them specially mention insubordination. He started complaining to Ms. Albright about Ms. Robinson's conduct sometime around spring 2017 and says he did so about eight or times while employed. The wrist-flipping incident happened in July 2017. Ms. Robinson allegedly asked Dunn about the size of his penis sometime around fall 2017. Dunn testified that Ms. Robinson's sexual harassment stopped about a month or so before his termination, but Dunn, however, texted Ms. Albright on December 9, 2017, asking her to, "Please have [Ms. Robinson] stop[] her . . . harassing behavior." [Doc. 20-1, p. 2].

Following Dunn and Ms. Albright's text messaging, Ms. Albright and Mr. Himebaugh met with Dunn, and Ms. Albright made notes about what they discussed. Here is Ms. Albright's verbatim account of what transpired.

> Mr. Himebaugh and myself brought Bernard Dunn into office to talk to him about when he comes into work, clock in and do his job, and take care of

> our customers, and do his cleaning then when management checks him out
> for him to clock out and then go home. I told him it is going to end about
> him complaining about Stephanie when he has been told that management
> took care of the problem with her and that she has not said anything to him.
> I also told Bernard do not be texting me. Bernard kept trying to talk over
> me and would not listen and being argumentative. I terminated for
> insubordination. During the time Bernard has been employed it has been
> impossible to talk to him about his job performance without him arguing
> and blaming other employees.

[Doc. 17-2, p. 34]. Taking a wholistic look at the evidence in this case, while bearing in mind the Court's duty to draw "all justifiable inferences" in the light most favorable to Dunn, as the nonmovant, two things could have occurred on the day Dunn was terminated. *Anderson*, 477 U.S. at 255; *Gogel*, 967 F.3d at 1134.

On one hand, there is Ms. Albright's version. She wrote that "management took care of the problem" with Ms. Robinson and that Dunn's complaints about Ms. Robinson were "going to end." [Doc. 17-2, p. 34]. On the other hand, there is Dunn's version—a version in which he unequivocally testified that "toward the last month or so" Ms. Robinson's conduct "stopped." [Doc. 17-2, Dunn Depo., p. 43:15]. Then why the text message from December 9, 2017? Did Ms. Robinson do something else that caused Dunn to ask Ms. Albright to "Please have [Ms. Robinson] stop"? [Doc. 20-1, p. 2]. We simply don't know. However, a judge-drawn, justifiable inference made in Dunn's favor, as the nonmovant, is that something might have occurred just before his termination date and that Ms. Robinson's conduct—although it may have stopped— started again. *Anderson*, 477 U.S. at 255.

Set upon this record, a reasonable jury could find that Dunn, for whatever reason, thought or felt that the problems with Ms. Robinson weren't taken care of, prompting his December 9, 2017, complaint via text message. During Dunn's termination meeting, Ms. Albright "told [Dunn]" that everything between him and Ms. Robinson had been handled and that "hi[s] complaining" about her "is going to end," but Dunn felt differently because he, obviously, by Ms. Albright's own account, continued to complain. [Doc. 17-2, p. 34]. About what, though? Ms. Albright's notes say that Dunn "kept trying to talk over her" and was "argumentative[,]" but they provide no detail as to what Dunn was trying to talk over her about.[19] [*Id.*]. Was it about Ms. Robinson? His work performance? His previous instances of arguing with management? His previous complaints about sexual harassment? We just don't know.

Regardless of the level of volume in the room that day, the justifiable inference drawn in Dunn's favor is either that Ms. Albright might have never believed Dunn's complaints about Ms. Robinson or that Ms. Robinson's conduct could have started back up. Either of these could have caused Dunn to continue to *oppose* what was happening at work. If the evidence at trial reveals that Dunn kept on and on about Ms. Robinson's conduct during the termination meeting, a reasonable jury could conclude that Ms. Albright—based on her perspective that "management took care of the problem"—

---

[19] Conversely, Dunn, when discussing his termination meeting at his deposition, testified that there wasn't any arguing between him or Ms. Albright. [Doc. 17-2, Dunn Depo., p. 36:12–17].

invoked Smith & Sons' insubordination policy and fired Dunn. *See, e.g.*, [Doc. 17-2, p.

13]. If this is proven at trial, a jury could reasonably conclude that Ms. Albright violated

not only Title VII's opposition clause but Smith & Sons' own anti-harassment policy

clearly stating that "There will be no retaliation against any employee on account of the

employee's filing of a complaint or participating in an investigation under this policy."

[Doc. 17-2, p. 107]; *see also* [Doc. 17-2, p. 11 ("Smith & Sons Foods, Inc. will not retaliate

against any individual for complaining about or reporting harassment . . . .")].

Again, looking at this record as a whole and the law governing retaliation in this

circuit, the Court cannot conclude as a matter of law that Ms. Albright's decision to

terminate Dunn wasn't the product of an intent to retaliate, and Dunn has established a

prima facie case for retaliation. *Gogel*, 967 F.3d at 1135. Dunn made a complaint about

sexual harassment when he, via his text message, opposed Ms. Robinson's conduct.

Engagement in protected activity, check. And, on the same day, he was terminated.

Adverse employment action and casual relation.[20] Check. *Goldsmith*, 513 F.3d at 1277.

Now, with the burden on Smith & Sons, it proffers Dunn's "insubordination by

arguing with management" as its legitimate, nonretaliatory reason for his termination.

[Doc. 17-2, p. 120]. With insubordination in play as the reason Smith & Sons claims to

---

[20] The adverse employment action must be causally related to the protected activity, and the temporal proximity between the two "must be very close." *Gogel*, 967 F.3d at 1134–35 (citations omitted). Without question Dunn can establish temporal proximity seeing as he was fired within mere hours of complaining about Ms. Robinson to Ms. Albright in their text messages.

have motivated Ms. Albright's decision, Dunn must "meet that reason head on and rebut it." *Gogel*, 967 F.3d at 1136 (citations omitted). That is, Dunn must show that his insubordination was pretext—a cover up to mask Ms. Albright's intent to retaliate. To establish pretext, at the summary-judgment stage," Dunn has to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Smith & Sons' "proffered legitimate reason[ ] for its actions that a reasonable factfinder could find [it] unworthy of credence." *Id.*

Easily, a reasonable jury could find that Dunn's complaining about Ms. Robinson could be what Ms. Albright labeled as insubordination. This presents two scenarios. Under the first, if the evidence warranted, a jury could determine that Dunn's complaining was so out of line that it rose to the level of insubordination. After all, employees don't have the legal right to behave belligerently or excessively to the point of being disrespectful to a supervisor. Some level of civility must be maintained within the employer-employee relationship even when the employee disagrees with his employer's decisions. Again, depending on how the evidence plays out, if a jury finds that Dunn's behavior crossed the line—by improperly voicing his differing opinion about whether "management took care of the problem" with Ms. Robinson or by reporting valid complaints of sexual harassment after a supervisor told him he could no longer do so—then it becomes a question of fact as to whether Smith & Sons fired Dunn for *that* reason.

Under the second scenario, if, as Dunn testified, he never argued with Ms. Albright, then his respectful, yet persistent complaints likely fall under the protection of Title VII's opposition clause. No matter the scenario, either of them are permissible, legitimate inferences that can be made from the record evidence. Thus, it will be up to the jury to determine whether Dunn was fired for being insubordinate or for engaging in statutorily protected activity. If the jury finds the former—Dunn loses. If it finds the latter—Dunn wins.

Notwithstanding the coldness of this record—leaving open countless factual avenues which, in turn, leave open legitimate inferences that can only be made by a jury—it contains just enough to permit Dunn the opportunity to present his case to a jury. *Anderson*, 477 U.S. at 255. That is not to say this road will be an easy one. There are numerous up-hill credibility determinations to overcome and many inferences to be drawn from the evidence.

All in all, with respect to retaliation, too much remains to be seen regarding what was said in Dunn's termination meeting. Simply put, with the record as empty as it is, it would be inappropriate to conclude that Smith & Sons has pointed out to the Court that there is an absence of evidence to support this claim. *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Accordingly, the Court must **DENY** summary judgment to Smith & Sons on Dunn's retaliation claim.

42

As a closing matter, the Court's decision to analyze Dunn's retaliation claim through the circumstantial evidence approach should not be understood to mean that what is contained in Ms. Albright's notes regarding Dunn's termination meeting does not meet the definition for direct evidence of retaliation under the Eleventh Circuit's guidance in *Merritt v. Dillard Paper Company*. 120 F.3d 1181 (11th Cir. 1997); *see also Tsavaris v. Savannah L. Sch., LLC*, No. 20-11150, slip op. at 8 (11th Cir. Feb. 25, 2021) (discussing direct evidence of age discrimination). Direct evidence is that "which if believed, proves existence of fact in issue without inference or presumption." *Merritt*, 120 F.3d at 1189. It is evidence where statements of an employer "reflect a . . . retaliatory attitude correlating to the retaliation complained of by the employee." *Id.*

Ms. Albright's notes undeniably state her position that "it is *going to end* about [Dunn] complaining about [Ms. Robinson]." [Doc. 17-2, p. 34] (emphasis added). Based on the facts presented to the Court at summary judgment, Ms. Albright's decisive statement takes one of two paths: Either Dunn stops complaining about Ms. Robinson or Ms. Albright fires him if he doesn't. Should the jury find the second path more likely than the first (given that Ms. Albright fired Dunn when his complaining didn't end), then he would have direct evidence of retaliation. And this is, after all, what Dunn claims—that his "ultimate insubordination *was* his persistent complaints of sexual harassment" since Smith & Sons "made no effort to protect him." [Doc. 20, p. 16].

<u>CONCLUSION</u>

As discussed above, the Court **DENIES** Defendant Smith & Sons, Inc.'s Motion for Summary Judgment [Doc. 17]. While Dunn may not ultimately win on either of his claims, he will get the chance to take them to a jury. The Court will issue an Order directing the parties to submit a Proposed Pretrial Order, and it sets this case for trial during its April 2021 Trial Term.

**SO ORDERED**, this 25th day of February, 2021.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**